**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| John P. Vlach, | : | Case No. 1:12 CV 2452 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| Defendant, | : | **RECOMMENDATION** |

**I. INTRODUCTION**

Plaintiff John P. Vlach ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 (Docket No. 1).

Pending are the parties' Briefs on the Merits (Docket Nos. 17 and 18) and Plaintiff's Reply (Docket

No. 20). For the reasons that follow, the Magistrate recommends that the decision of the Commissioner

be affirmed.

1

## II. PROCEDURAL BACKGROUND

On April 28, 2009, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 13, p. 112 of 369). On that same day, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 13, p. 119 of 369). In both applications, Plaintiff alleged a period of disability beginning December 26, 2008 (Docket No. 13, pp. 112, 119 of 369). Plaintiff's claims were denied initially on July 21, 2009 (Docket No. 13, pp. 62, 65 of 369), and upon reconsideration on March 12, 2010 (Docket No. 13, pp. 73, 79 of 369). Plaintiff thereafter filed a timely written request for a hearing on March 22, 2010 (Docket No. 13, p. 86 of 369).

On May 23, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Alfred J. Costanzo ("ALJ Costanzo") (Docket No. 13, pp. 30-57 of 369). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 13, pp. 54-56 of 369). ALJ Costanzo found Plaintiff to have a severe combination of lower extremity pain status post fracture, depressive disorder, and borderline intellectual functioning (Docket No. 13, p. 18 of 369).

Despite these limitations, ALJ Costanzo determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of his decision (Docket No. 13, p. 25 of 369). ALJ Costanzo found Plaintiff had the residual functional capacity to perform sedentary work with the following limitations: (1) only occasional postural activity; and (2) only simple, routine, repetitive tasks performed in a stable work environment with minimal changes in the work process from day-to-day (Docket No. 13, p. 20 of 369). Plaintiff's request for benefits was therefore denied (Docket No. 13, p. 25 of 369).

On October 1, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern

Division, seeking judicial review of his denial of DIB and SSI (Docket No. 1). In his pleading, Plaintiff

alleged that the ALJ erred: (1) in finding that Plaintiff's mental impairment does not meet the Listing

criteria for mental retardation; and (2) in determining Plaintiff's residual functional capacity (Docket

No. 17, pp. 7-14 of 14). Defendant filed its Answer on January 10, 2013 (Docket No. 12).

### III. FACTUAL BACKGROUND

### A.    THE ADMINISTRATIVE HEARING

An administrative hearing convened on May 23, 2011, with Plaintiff appearing via video from

Erie, Pennsylvania (Docket No. 13, pp. 16 and 30 of 369). Plaintiff, represented by counsel Mira

Chopra, appeared and testified (Docket No. 13, pp. 35-54 of 369). Also present and testifying was VE

Samuel Edelmann ("VE Edelmann") (Docket No. 13, pp. 54-56 of 369).

### 1.    PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was a divorced father of five children, one of whom he

retains full custody of, who resided with his girlfriend, his brother, and two of his children (Docket No.

13, pp. 36-37 of 369).[1] Plaintiff testified that he was currently seeking full custody of his other children

(Docket No. 13, p. 36 of 369). Plaintiff graduated from high school, where he was enrolled in special

education classes (Docket No. 13, p. 37 of 369). Plaintiff has a driver's license and has never lived by

himself (Docket No. 13, pp. 53-54 of 369).

Immediately prior to his disability, Plaintiff worked for Tree Time Nursery doing manual labor,

including unloading, moving and potting plants, operating a tractor, and lifting (Docket No. 13, pp. 38-

39 of 369). Before Tree Time, Plaintiff worked for WEK, a plastics factory, running a press machine

---

[1] Plaintiff has five children, four from his previous marriage and a newborn daughter with his
current girlfriend, with whom he now lives (Docket No. 13, p. 359 of 369).

3

making heater ducts for automobiles (Docket No. 13, p. 40 of 369). Plaintiff also worked for Four Tran Printing making car antennas (Docket No. 13, pp. 41-42 of 369). Plaintiff testified that he had never been terminated from a job, but did indicate that he felt it took him longer than other employees to learn a job (Docket No. 13, pp. 43, 44-46 of 369).

Plaintiff testified primarily about his ankle injury, which he stated "hurts all the time and throbs" (Docket No. 13, p. 47 of 369). Plaintiff rated his pain as a ten, with ten being the most severe, and stated that he wears a brace and props up his leg but only takes over-the-counter pain medication (Docket No. 13, pp. 47, 50 of 369). Plaintiff testified that he sometimes feels as though he needs more pain relief, but indicated that he does not like to take medication (Docket No. 13, pp. 51-52 of 369). When asked why he does not seek further treatment for his ankle, Plaintiff stated that he "can't" because he takes care of his daughter and doesn't "have time most of the time" (Docket No. 13, p. 48 of 369).

With regard to residual functional capacity, Plaintiff stated that he could stand for thirty minutes but had not yet tried walking any significant distance (Docket No. 13, p. 49 of 369). Plaintiff indicated that he does not go grocery shopping because it requires too much walking (Docket No. 13, p. 49 of 369). He does not do any household chores, but does drive his daughter to the bus stop every day (Docket No. 13, pp. 49-50 of 369). Plaintiff indicated that he could comfortably lift twenty pounds but could not consistently lift something like a gallon of milk because of his ankle pain (Docket No. 13, p. 52 of 369).

2.    VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work at Tree Time Nursery as unskilled and heavy, and his

4

past work at the plastics factory and printing company as semi-skilled and medium (Docket No. 13, p. 55 of 369).

> ALJ Costanzo then posed the following hypothetical:
>
> Consider [Plaintiff's] age . . . [t]welve years of schooling, it was special ed. And consider . . . the work that you've just classified. Assume that he is limited to sedentary work with only occasional postural activities. I want you to assume that he's limited to unskilled work and that he needs a stable work environment with minimal change in the work process from day to day. With that profile would there be other work?

(Docket No. 13, p. 55 of 369). VE Edelmann answered in the affirmative, stating that such an individual could perform several jobs in the national economy, including: (1) telephone clerk, listed under DOT 237.167-018, for which there are 104,000 positions nationally; (2) assembly worker, listed under DOT 706.684-022, for which there are 75,000 positions nationally; and (3) sorter/grader, listed under DOT 681.687-018, for which there are 14,000 positions nationally (Docket No. 13, pp. 55-56 of 369).

On cross-examination, Plaintiff's counsel posed the following question to the VE: "[i]f a person has the same limitations that the Judge described in his first hypothetical but there was an additional limitation of the need to limit the jobs to SVP 1 jobs?" (Docket No. 13, p. 56 of 369).[2] The VE testified that there are no sedentary jobs at an SVP 1 of which he is aware (Docket No. 13, p. 56 of 369).

## B.    MEDICAL RECORDS

Plaintiff's medical records regarding his ankle injury date back to January 2, 2009, when he underwent an x-ray of his right ankle (Docket No. 13, pp. 294, 295, 296, 297, 333, 334, 335 of 369).

---

[2] The Dictionary of Occupational Titles ("DOT") lists a "specific vocational preparation" ("SVP") time for each described occupation, which is the time it takes an individual to learn the job. This SVP is based on the skill level definitions found in 20 C.F.R. §§ 404.1568 and 416.968. An SVP of one corresponds to unskilled work. SSR 00-4p, 2000 SSR LEXIS 8 (Dec. 4, 2000).

The x-ray showed that Plaintiff suffered an oblique fracture through the distal fibula with a three to four millimeter posterior displacement of the distal fragment (Docket No. 13, pp. 294, 295, 296, 297, 333, 334, 335 of 369). On February 9, 2009, a second x-ray confirmed a non-displaced fracture of the distal fibular with an approximate anatomic alignment (Docket No. 13, pp. 289, 302, 328 of 369).

On March 27, 2009, Plaintiff saw Dr. Shana Miskovsky ("Dr. Miskovsky") for his ankle injury (Docket No. 13, pp. 281, 282 of 369). Plaintiff presented with a decreased range of motion, although his right ankle was stable and had minimal swelling (Docket No. 13, pp. 281, 282 of 369). Plaintiff was diagnosed with a right ankle distal fibular fracture and sent for physical therapy (Docket No. 13, pp. 281, 282 of 369). Dr. Miskovsky advised Plaintiff that he could not return to work for four weeks unless he could be placed on restrictive sedentary light duty (Docket No. 13, pp. 281, 283 of 369).

On April 24, 2009, Plaintiff returned to Dr. Miskovsky for a follow-up evaluation of his right ankle (Docket No. 13, pp. 275, 276 of 369). Notes from this visit indicate that Plaintiff walked in "very well" and without a limp (Docket No. 13, pp. 275, 276 of 369). Plaintiff stated that he had been doing better and had no significant pain (Docket No. 13, pp. 275, 276 of 369). An examination revealed that Plaintiff had no swelling in his right ankle, nor any bony tenderness over the distal fibula, and had excellent range of motion (Docket No. 13, pp. 275, 276 of 369). Plaintiff's ankle was stable (Docket No. 13, pp. 275, 276 of 369). Dr. Miskovsky recommended that Plaintiff participate in physical therapy (Docket No. 13, pp. 275, 276 of 369). Plaintiff was cleared to return to work *without* restriction on May 18, 2009 (Docket No. 13, pp. 275, 276 of 369).

At the request of the Ohio Department of Job and Family Services ("ODJFS"), Plaintiff underwent a physical therapy evaluation with Jennifer Diahl ("Ms. Diahl") on September 22, 2009 (Docket No. 13, pp. 311-12 of 369). At that time, Plaintiff reported that he could not work and was

applying for disability (Docket No. 13, p. 311 of 369). Plaintiff was able to ambulate without any antalgia, and squat with minimal difficulty (Docket No. 13, p. 311 of 369). He could sit for two hours, stand for thirty minutes, and walk for twenty minutes (Docket No. 13, p. 311 of 369). Plaintiff was also able to lift and carry thirty pounds and pull seventy pounds (Docket No. 13, p. 311 of 369). Plaintiff complained of pain and limitations, but no such impairments were observed by Ms. Diahl (Docket No. 13, p. 311 of 369).

On February 3, 2010, Plaintiff saw Dr. A. Seenam Lee, MD ("Dr. Lee") at the request of the Bureau of Disability Determination ("BDD") (Docket No. 13, pp. 308-09 of 369). Plaintiff had difficulty standing and walking for long periods of time but had a normal gait (Docket No. 13, p. 308 of 369). Plaintiff was diagnosed with right ankle pain (Docket No. 13, p. 308 of 369).

## C.  EDUCATIONAL RECORDS

Plaintiff's educational records date back to December 4, 1975, when Plaintiff underwent psychological and academic testing with school psychologist Dr. Carolyne Johnson ("Dr. Johnson") based on a report that Plaintiff was unable to follow directions and unable or unwilling to communicate with others (Docket No. 13, p. 358 of 369). Results from a Stanford-Binet test[3] revealed that Plaintiff's intellectual potential was in the moderately retarded range (Docket No. 13, p. 358 of 369). His visual motor ability was equal to that of a three-year-old while his word knowledge was equal to that of a four-year-old (Docket No. 13, p. 358 of 369). Plaintiff demonstrated delayed receptive language development and inadequate expressive ability (Docket No. 13, p. 358 of 369).

Plaintiff underwent a second evaluation with Dr. Johnson on March 2, 1977 (Docket No. 13,

---

[3] A test used to measure intelligence, mostly in children. ATTORNEYS' DICTIONARY OF MEDICINE, S-108990 (2009).

7

pp. 355-56 of 369). Dr. Johnson noted that Plaintiff's physical growth was somewhat slow, but reported that his speech had improved, although he was still hard to understand (Docket No. 13, p. 355 of 369). Dr. Johnson recommended that Plaintiff be placed in the slow learner class at the primary level (Docket No. 13, p. 356 of 369).

On June 4, 1979, Plaintiff underwent a Multi-Factored Evaluation (Docket No. 13, pp. 353-54 of 369). Plaintiff's IQ test revealed a full-scale IQ score of sixty-four (Docket No. 13, p. 353 of 369). A Vineland Social Maturity test[4] assessed Plaintiff's social age as 8.0 years, indicating low-average (Docket No. 13, p. 353 of 369). Dr. Johnson recommended that Plaintiff remain in a class for educationally handicapped children (Docket No. 13, p. 354 of 369).

Plaintiff underwent a second Multi-Factored Evaluation on December 8, 1981 (Docket No. 13, pp. 351-52 of 369). Plaintiff's IQ test revealed a verbal score of sixty-five, a performance score of fifty-eight, and a full-scale IQ score of fifty-eight (Docket No. 13, p. 351 of 369). Plaintiff's Vineland Social Maturity score was 10.4 years (Docket No. 13, p. 351 of 369). Plaintiff was diagnosed with a developmental handicap (Docket No. 13, p. 352 of 369). A third Multi-Factored Evaluation, performed on October 15, 1984, found that Plaintiff had a verbal IQ score of sixty-two, a performance IQ score of sixty-four, and a full-scale IQ score of fifty-nine (Docket No. 13, p. 349 of 369).

During another Multi-Factored Evaluation administered by Dr. Johnson on June 1, 1987, Plaintiff earned a full-scale IQ score of fifty-nine, with verbal and performance scores of sixty-two and sixty-four, respectively (Docket No. 13, p. 346 of 369). Dr. Johnson noted that Plaintiff's strengths included his: (1) short-term auditory memory; (2) comprehension/appraisal of social situations; and (3)

---

[4] A psychological test to estimate the degree of social maturity. It is based on the presence or absence of social behavior characteristics. ATTORNEYS' DICTIONARY OF MEDICINE, V-123555 (2009).

attention, motivation, and execution of simple rote copying tasks (Docket No. 13, p. 346 of 369). He demonstrated particularly weak skills in the area of expressive vocabulary relative to word definitions and fund of general information (Docket No. 13, p. 346 of 369). Plaintiff had difficulty focusing his attention to tasks and was prescribed Ritalin, which seemed to help (Docket No. 13, p. 347 of 369). Plaintiff was diagnosed with a developmental handicap (Docket No. 13, p. 348 of 369).

On October 16, 1991, at the age of twenty-one, Plaintiff indicated a desire to obtain his high-school diploma after previously dropping out of school (Docket No. 13, p. 342 of 369). Plaintiff earned a full-scale IQ score of sixty-five, with verbal and performance scores of sixty-three and sixty-five, respectively (Docket No. 13, p. 342 of 369). Plaintiff's Vineland Social Maturity score assessed Plaintiff's age at 12.3 years (Docket No. 13, p. 343 of 369). Plaintiff's responses to verbal questions were somewhat delayed and the quality of his responses were below average (Docket No. 13, p. 342 of 369).

## D.   EVALUATIONS

In August 2009, Dr. Lee completed a basic medical evaluation for Plaintiff at the request of ODJFS (Docket No. 13, pp. 314-15 of 369). Dr. Lee reported that Plaintiff could: (1) stand/walk for less than one hour during an eight-hour workday and for less than thirty minutes without interruption; (2) lift/carry eleven to twenty pounds frequently; and (3) lift/carry eleven to twenty pounds occasionally (Docket No. 13, p. 315 of 369). Dr. Lee concluded that Plaintiff was unemployable (Docket No. 13, p. 315 of 369).

On March 9, 2010, Plaintiff underwent a Physical Residual Functional Capacity Assessment with state examiner Dr. Gerald Klyop, MD ("Dr. Klyop") (Docket No. 13, pp. 316-23 of 369). Dr. Klyop determined that Plaintiff could: (1) lift and/or carry fifty pounds occasionally; (2) lift and/or

9

carry twenty-five pounds frequently; (3) stand and/or walk for six hours during an eight-hour workday; (4) sit for six hours during an eight-hour workday; and (5) engage in unlimited pushing and pulling (Docket No. 13, p. 317 of 369). Plaintiff had few postural limitations, including only occasional climbing of ramps and stairs and never climbing ladders, ropes, or scaffolds (Docket No. 13, p. 318 of 369). Plaintiff had no manipulative, visual, communicative, or environmental limitations (Docket No. 13, pp. 319-20 of 369).

On June 24, 2011, following the administrative hearing and at the request of ALJ Costanzo, Plaintiff underwent a psychological evaluation with clinical psychologist Richard C. Halas, M.A. ("Mr. Halas") (Docket No. 13, pp. 359-65 of 369). Plaintiff reported a history of psychiatric interventions but denied any inpatient hospitalizations (Docket No. 13, p. 360 of 369). During the evaluation, Plaintiff demonstrated a slow speech pattern, giving short, specific, goal-oriented responses (Docket No. 13, p. 361 of 369). Plaintiff had slightly limited coherency and relevancy of responses (Docket No. 13, p. 361 of 369). Plaintiff had a marked poverty of speech with no specific evidence of perseveration of responses (Docket No. 13, p. 361 of 369). Plaintiff maintained good eye contact and denied any crying spells or thoughts of hurting himself or others (Docket No. 13, p. 361 of 369). He did not present with any characteristics consistent with a thought disorder or psychotic process (Docket No. 13, p. 361 of 369).

With regard to sensorium and cognitive functioning, Plaintiff was reasonably oriented to time, place, and person (Docket No. 13, p. 362 of 369). His short-term memory was below average and he could not do simple calculations or serial seven's (Docket No. 13, p. 362 of 369). Plaintiff's general intelligence level was estimated to be in the low-average range (Docket No. 13, p. 362 of 369). His insight and judgment were poor and below average (Docket No. 13, p. 362 of 369).

10

After administering a Wechsler Adult Intelligence[5] evaluation Plaintiff earned a full-scale IQ score of sixty-six (Docket No. 13, p. 362 of 369). Plaintiff was significantly below average in most all of the areas tested, including mathematical skills, visual puzzles, matrix reasoning, whole-part conceptualization, verbal abstractions, and current fund of information (Docket No. 13, p. 362 of 369).

Mr. Halas diagnosed Plaintiff with alcohol abuse disorder, depressive disorder not otherwise specified, and borderline intellectual functioning, and assigned him a Global Assessment of Functioning[6] score of forty-five (Docket No. 13, p. 363 of 369). Plaintiff was found to have deficits in a number of categories, including his ability to: (1) understand, remember, and carry out instructions; (2) maintain attention and concentration, and maintain persistence and pace to perform simple and multi-step tasks; (3) respond appropriately to supervision and coworkers in a work setting; and (4) manage funds (Docket No. 13, pp. 363-64 of 369).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a

---

[5] An intelligence scale based on verbal and performance material which takes into consideration the age of the subject. The verbal scale or test consists of six subjects or subtests which deal with general information, general comprehension, digit span, arithmetic, similarities, and vocabulary. The performance test includes picture arrangement, picture completion, block design, object assembly, and digit symbol. ATTORNEYS' DICTIONARY OF MEDICINE, W-124572 (2009).

[6] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of 45 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994). Although Plaintiff's overall score was 45, his functional severity was assessed at 60 (Docket No. 13, p. 363 of 369), indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV, 34.

"disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42

U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same

definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI

claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time

he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th

Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at

730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do

basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to

be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment

meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual

functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity

is an administrative "assessment of [the claimant's] physical and mental work abilities – what the

individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS

126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum*

remaining ability to do sustained work activities in an ordinary work setting on a **regular and**

**continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an

equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Costanzo made the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013.

2   Plaintiff has not engaged in substantial gainful activity since December 26, 2008, the alleged onset date.

3.  Plaintiff has the following severe impairments: lower extremity pain status post fracture, depressive disorder, and borderline intellectual functioning.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.

5.  Plaintiff has the residual functional capacity to perform sedentary work with the following limitations: (1) only occasional postural activity; (2) only simple, routine, repetitive tasks performed in a stable work environment with minimal changes in

13

the work process from day-to-day.

6.      Plaintiff is unable of performing past relevant work.

7.      Plaintiff was born on December 28, 1969, and was 38-years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.      Plaintiff has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job skills.

10.     Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11.     Plaintiff has not been under a disability, as defined in the Social Security Act, from December 26, 2008, through the date of this decision.

(Docket No. 13, pp. 16-25 of 369). ALJ Costanzo denied Plaintiff's request for DIB and SSI benefits

(Docket No. 13, p. 25 of 369).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-

33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's

conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner,* 383 F.2d 614, 626-27

(6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial

evidence shall be conclusive . . ." *McClanahan,* 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

14

*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.  PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff alleges that the ALJ erred: (1) in finding that Plaintiff's mental impairment does not meet the Listing criteria for mental retardation; and (2) in determining Plaintiff's residual functional capacity (Docket No. 17, pp. 7-14 of 14).

### B.  DEFENDANT'S RESPONSE

Defendant contends that the ALJ properly determined that Plaintiff suffers from borderline intellectual functioning, *not* mental retardation, as those impairments are defined in the Listings (Docket No. 18, pp. 10-13 of 17). Defendant also argues that the ALJ properly assessed Plaintiff's residual functional capacity (Docket No. 18, pp. 13-17 of 17).

### C.  DISCUSSION

#### 1.  MENTAL RETARDATION

Plaintiff first argues that the ALJ erred by failing to find that Plaintiff satisfied the requirements of Listing § 12.05(C), mental retardation, when the ALJ failed to find that Plaintiff has deficits in adaptive functioning (Docket No. 17, pp. 7-11 of 14). According to Plaintiff, ALJ Costanzo failed to adequately discuss Plaintiff's educational records when rendering his decision, despite an obligation to do so (Docket No. 17, pp. 10-11 of 14).

The introduction to Listing 12.05 states that "[m]ental retardation refers to significantly subaverage general intellectual functioning with *deficits in adaptive functioning* initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. § 404, subpart P, appendix 1 (emphasis added). In addition to these deficits in adaptive functioning, the required level of severity for mental retardation is met when at least one of four additional criteria is met. 20 C.F.R. § 404, subpart P, appendix 1. At issue in this case is 12.05C, which requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. § 404, subpart P, appendix 1.

Here, it is clear that Plaintiff in fact meets the additional criteria set forth in 12.05C. Plaintiff underwent multiple IQ tests, with his full-scale IQ scores ranging from fifty-eight to sixty-five (Docket No. 13, pp. 342, 346, 349, 351, 353 of 369).[7] Furthermore, in his July 2011 decision, ALJ Costanzo determined that Plaintiff suffered from several severe impairments, including lower extremity pain status post fracture and depressive disorder (Docket No. 13, p. 18 of 369). According to the Listing itself, the presence of additional "severe" impairments automatically satisfies the "additional and significant work-related limitation" requirement. The introduction to § 12.00 states:

> For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s) as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are 'severe' as defined in [these sections], we will not find that the additional impairment(s) imposes

---

[7] In June 1979, Plaintiff earned a full-scale IQ score of sixty-four (Docket No. 13, p. 353 of 369). In December 1981, Plaintiff's full-scale IQ score was fifty-eight (Docket No. 13, p. 351 of 369). In October 1984, his full-scale IQ score was fifty-nine (Docket No. 13, p. 349 of 369). By June 1987, Plaintiff's score jumped to sixty-four (Docket No. 13, p. 346 of 369). And in October 1991, when Plaintiff was nearly twenty-two years old, his full-scale IQ score was sixty-five (Docket No. 13, p. 342 of 369).

> 'an additional and significant work-related limitation of function,' even if you are unable
> to do your past work because of the unique features of that work.

20 C.F.R. § 404, subpart P, appendix 1. Therefore, the mere fact that the ALJ determined that Plaintiff

suffers from additional impairments that are "severe" satisfies the remainder of Listing 12.05C.

However, the issue in this case is not whether Plaintiff satisfies the *specific* requirements of

Listing 12.05C. By Plaintiff's own admission, the issue in this case is whether Plaintiff satisfies the

*introductory requirements* of Listing 12.05, namely whether Plaintiff suffers from "deficits in adaptive

functioning" (Docket No. 17, p. 9 of 14). Based on Plaintiff's entire record, he does not satisfy this

basic introductory requirement.

According to the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), adaptive

functioning "refers to how effectively individuals cope with common life demands and how well they

meet the standards of personal independence expected of someone in their particular age group,

sociocultural background, and community setting." DSM-IV. It may "be influenced by various factors,

including education, motivation, personality characteristics, social and vocational opportunities, and

the mental disorders and general medical conditions that may coexist with Mental Retardation." DSM-

IV. Impairments in adaptive functioning can occur in several areas, including: "communication, self-

care, home living, social/interpersonal skills, use of community resources, self-direction, functional

academic skills, work, leisure, health, and safety." DSM-IV.

As a child, Plaintiff had difficulties with communication (Docket No. 13, p. 355 of 369), self-

help (Docket No. 13, p. 351 of 369), socialization (Docket No. 13, p. 351 of 369), and functional

academic skills (Docket No. 13, pp. 346-47 of 359). Plaintiff dropped out of high school in the

eleventh grade after having been placed in special education classes beginning in the first grade

(Docket No. 13, p. 359 of 369). Furthermore, Plaintiff's Vineland Social Maturity age was consistently

17

younger than his actual age (Docket No. 13, pp. 343, 351, 353 of 369). However, Plaintiff was never actually diagnosed with mental retardation; rather, he was only diagnosed with a developmental handicap (Docket No. 13, pp. 348, 352 of 369).

At the time of his administrative hearing, Plaintiff was forty-one years old (Docket No. 13, p. 30 of 369). As an adult, Plaintiff has actively sought and earned his high school diploma (Docket No. 13, pp. 37, 342, 360 of 369) and maintained consistent employment doing both unskilled and semi-skilled jobs (Docket No. 13, p. 55 of 369). Despite indicating that it sometimes took him longer to learn a job, Plaintiff testified that he has never been terminated from a job (Docket No. 13, pp. 43, 44-46 of 369). Even more importantly, Plaintiff did not stop working in 2008 because of his mental deficits; rather, he stopped working because of an ankle injury (Docket No. 13, pp. 37-38 of 369).

In his personal life, Plaintiff has been married and currently has five children, four with his ex-wife and a newborn with his current girlfriend (Docket No. 13, pp. 36-37 of 369). Plaintiff has custody of one child and lives with his newborn daughter (Docket No. 13, pp. 36-37 of 369). During his testimony, Plaintiff indicated that he was seeking *full* custody of his other three children (Docket No. 13, p. 36 of 369). Plaintiff drives (Docket No. 13, pp. 49-50, 361 of 369) and can take care of his own personal hygiene needs (Docket No. 13, p. 362 of 369). Based on a full psychological evaluation, Mr. Halas diagnosed Plaintiff with borderline intellectual functioning, even given Plaintiff's most current full-scale IQ score of sixty-six and his GAF score of forty-five (Docket No. 13, pp. 363, 365 of 369).

Plaintiff alleges that the ALJ's failure to discuss Plaintiff's educational records warrants, at the very lease, a remand to the Commissioner for consideration of these records (Docket No. 17, p. 10 of 14). Plaintiff is correct in stating that an ALJ is required to consider all evidence of record (Docket No. 17, pp. 10-11 of 14). While it may be ideal for an ALJ to set forth his reasons specifically crediting or

18

discrediting each and every submitted medical opinion of record, it is well settled in the Sixth Circuit that "an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party . . . so long as his factual findings as a whole show that he implicitly resolved [any] conflict." *Loral Defense Systems-Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999). An ALJ is "not required to discuss or summarize every piece of evidence in the record." *Szymanski v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 117096, *22-23 (N.D. Ohio 2011). There is no requirement that ALJ Costanzo specifically discuss Plaintiff's educational records in his decision. The ALJ described in detail Plaintiff's current abilities, including Plaintiff's past work in semi-skilled jobs (Docket No. 13, pp. 19, 22 of 369), his ability to care for his own personal needs and drive a car (Docket No. 13, pp. 19, 22 of 369), Plaintiff's IQ scores (Docket No. 13, p. 19 of 369), and his ability to work activity (Docket No. 13, p. 23 of 369).

Based on Plaintiff's functioning both as a child and as an adult, the evidence presented does not show that Plaintiff suffers from deficits in adaptive functioning. Therefore, Plaintiff does not meet the introductory requirement of Listing 12.05 necessary for a finding of mental retardation. Plaintiff's first assignment of error is without merit and the Magistrate recommends that the decision of the Commissioner be affirmed.

### 2.    RESIDUAL FUNCTIONAL CAPACITY

Plaintiff next argues that the ALJ's residual functional capacity assessment does not adequately accommodate Plaintiff's limitations in concentration, persistence, or pace (Docket No. 17, pp. 11-14 of 14). Specifically, Plaintiff alleges that ALJ Constanzo's residual functional capacity finding limiting Plaintiff to unskilled work that involves only simple, routine, repetitive tasks performed in a stable work environment with minimal changes does not account for Plaintiff's moderate difficulties in

19

concentration, persistence, or pace (Docket No. 17, pp. 11-14 of 14). Plaintiff's argument is without merit.

To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities. *Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). Residual functional capacity "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). Before making a final determination a claimant is not disabled, the Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family,

20

neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

ALJ Constanzo found Plaintiff to have moderate deficiencies in concentration, persistence, and pace (Docket No. 13, p. 20 of 369). Plaintiff relies on *Ealy v. Comm'r of Soc. Sec.* (594 F.3d 504 (6th Cir. 2010)), for the proposition that both a hypothetical question and a final residual functional capacity assessment must include speed- or pace-based restrictions "when an individual is found to have moderate limitations in concentration, persistence, or pace" (Docket No. 17, pp. 11-14 of 14). The undersigned disagrees.  In *Ealy*, the plaintiff's doctor *specifically* limited him to "simple repetitive tasks [for] [two-hour] segments over an eight-hour day where speed was not critical." 594 F.3d at 516. In the case at hand, neither Mr. Halas nor any other professional has placed Plaintiff under such a severe restriction (Docket No. 13, pp. 275-369 of 369).

In his psychological evaluation, Mr. Halas concluded that Plaintiff was "significantly below average in his ability to work in a rapid and accurate manner when performing a substitution task" (Docket No. 13, p. 362 of 369). Plaintiff also had significantly below average concentration skills (Docket No. 13, p. 363 of 369). However, Mr. Halas *also* concluded that Plaintiff did not have any significant deficits in responding appropriately to work pressures in a work setting (Docket No. 13, p. 364 of 369). Plaintiff has performed semi-skilled jobs in the past (Docket No. 13, p. 55 of 369). Furthermore, ALJ Costanzo did account for Plaintiff's speed- and pace-based restrictions by limiting him to only "simple, routine, repetitive tasks performed in a stable work environment with minimal changes in the work process from day to day" (Docket No. 13, p. 20 of 369).

It is worth noting Plaintiff's secondary argument that ALJ Costanzo failed to present an

accurate hypothetical to VE Edelmann (Docket No. 17, p. 13 of 14). In the Sixth Circuit, in order to be considered substantial evidence, a VE's testimony must be based on a hypothetical question which accurately portrays the claimant's physical and mental impairments. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). However, it is also "well established that an ALJ . . . is required to incorporate only those limitations accepted as credible by the finder of fact" into the hypothetical question. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Here, ALJ Costanzo did account for Plaintiff's limitations with regard to concentration, persistence, and pace to the extent that these limitations were supported by the record. In his hypothetical question to the VE, the ALJ stated that the VE was to assume that the individual was "limited to unskilled work and that he needs a stable work environment with minimal changes in the work process from day to day" (Docket No. 13, p. 55 of 369). Based on the evidence of record, there was no need for ALJ Costanzo to include any more limitation in this area, including specific speed- and pace-based limitations.

Therefore, the undersigned finds Plaintiff's second assignment of error to be without merit and recommends that the decision of the Commissioner be affirmed.

## VIII. CONCLUSION

For the foregoing reasons, the undersigned recommends that the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:  July 1, 2013

## IX. NOTICE

22

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.